IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN R. WILTGEN, JAMES MERCIER, JEFFREY MEYER, KAREN CRANE, JOHN HOBAN SR. AND JOHN HOBAN JR.<br><br>Plaintiffs,<br><br>Vs.<br><br>GREGORY WEBB, individually, and INFRAEGIS, INC., A DELAWARE CORPORATION<br><br>Defendants. | Case No. 09 cv 5352<br><br>Hon. Virginia M. Kendall |

**FIRST AMENDED COMPLAINT - JURY DEMANDED**

Plaintiffs JOHN R. WILTGEN, JAMES MERCIER, JEFFREY MEYER, KAREN CRANE, JOHN HOBAN SR., and JOHN HOBAN JR. (collectively "Plaintiffs") complain against INFRAEGIS, INC. a Delaware corporation, and GREGORY WEBB, individually, as follows:

**Facts Common to All Counts**

**Nature of The Action**

1.  This is a securities fraud action brought against InfraAegis, Inc. ("IA") and one of its officers and directors under the Securities Exchange Act of 1934, 15 U.S.C. §78(b) and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. §240.10b-5. Defendants induced Plaintiffs to purchase a total of 256,000 common shares of IA at a purchase price of $1.00 per share by knowingly making false and intentionally misleading statements. Plaintiffs also bring pendent claims under the Illinois Securities Act, and Illinois common law.

**Jurisdiction and Venue**

2.  The Court has subject matter jurisdiction pursuant to Section 27 of the Securities and Exchange Act of 1934, 15 USC §78aa, and under principles of pendent jurisdiction.

3. Venue is proper in this District and Division, pursuant to 28 U.S.C. § 1391, since a substantial part of the events giving rise to the claims stated herein occurred within this District.

### The Parties

4. Plaintiff John R Wiltgen ("Wiltgen") is a citizen of the State of Illinois and currently owns 125,000 shares of the Class A common stock of IA.

5. Plaintiff James Mercier ("Mercier") is a citizen of the State of Illinois and currently owns 75,000 shares of Class A common stock of IA.

6. Plaintiff Jeffrey Meyer ("Meyer") is a citizen of the State of Illinois and currently owns 26,000 shares of Class A common stock of IA.

7. Plaintiff Karen Crane ("Crane") is a citizen of the State of Illinois and currently owns 15,000 shares of Class A common stock of IA.

8. Plaintiff John Hoban Sr. ("Hoban Sr.") is a citizen of the State of Illinois and currently owns 10,000 shares of Class A common stock of IA.

9. Plaintiff John Hoban Jr. ("Hoban Jr.") is a citizen of the State of Illinois and currently owns 10,000 shares of Class A common stock of IA.

10. Defendant IA is a Delaware company, with its principal place of business located in the Village of Elk Grove, County of Cook, Illinois.

11. Defendant Webb was at all relevant times, and currently is, the Chairman of the Board, CEO of IA, and purports to be the owner of an unknown amount of Class A shares of IA stock, as well as all of the 60,000,000 Class B shares issued by IA. Webb is a citizen of Illinois. He holds himself out to be a former Navy Seal and military operative.

### InfraAegis' Business

12. IA was founded in 2003 and was originally formed under the name "IntelAgents, Inc.," subsequently changing its name to InfraAegis, Inc. IA was at all relevant times and currently is a company that promotes itself as a security technology and media distribution company that provides

products, solutions and counter measures to protect and defend borders, ports, mass transit systems, airports, financial institution systems, and critical infrastructures against acts of terrorism.

13. Defendant WEBB, the officer and director holds himself out to be a former military and civilian intelligence officer and operative of the United States familiar with the most sophisticated intelligence gathering and terrorist defense measures available.

### The Proposed Acquisition of V&P

14. During 2004, Michael Lang and Christopher Lang were two of the principal shareholders of a company named Verify and Protect, Inc. (*"V&P"*), a company they had co-founded.

15. V&P had developed and patented authentication and encryption technology trademarked and referred to as "Deep Cloak" and "Total Vault." The technology is principally for application in the financial industry, which allows for the secure authentication of users, the encryption of data, and the creation of digital signals without the use of digital certificates or third party certificate authorities.

16. During the latter part of 2004, IA, by its then described "Chief Scientist" Dr. John D. Butterworth, approached Michael and Christopher Lang as principal shareholders and co-founders of V&P, about melding the technology of IA and V&P. Dr. Butterworth believed V&P's technology was critical to the ability of IA to promote its business and assets to local, state, and national governments, as well as foreign cities and governments, and touted the prospective melding of the technology of IA and V&P as a "dream come true".

17. Following up on that initial contact, Webb, on behalf of IA, represented during the latter part of 2004 to the Langs, who were business acquaintances of the Plaintiffs that one of IA's major assets was its Nuclear/Radioactive Isotope Detection System *("Isotope Detection System")*, which itself was based upon sophisticated analysis of radiation detected by thallium-coated sodium iodide crystals. The Langs subsequently communicated same to Plaintiffs, and had their names added to the email or other prospectus lists of InfraAegis.

18. Webb represented that this technology was owned by IA, and utilized software algorithms to uniquely detect and distinguish threat isotopes from isotopes naturally occurring (*e.g.* in fish, bananas,

ceramic tile, etc.) to allow local and national security personnel to monitor and identify potential threats to public safety, including the inspection of cargo containers and other likely vehicles by which threatening substances would be transported.

19. Given the possible beneficial combination of IA and V&P, Webb at first suggested a joint venture between V&P and IA, and subsequently suggested an acquisition of V&P by IA.

20. Intrigued by the Isotope Detection System, which was represented by Webb to be the main asset of IA and the focal point of IA's business plan, Defendants and the Langs discussed the proposed joint venture suggested between IA and V&P, while the formal acquisition of V&P by IA was to be discussed at a later date.

21. In furtherance of the proposed joint venture, Michael Lang attended a presentation of IA's Isotope Detection System at the Argonne National Laboratory in September, 2004. At that presentation, Webb, on behalf of IA, again made representations to Lang and other potential investors that IA owned the Isotope Detection System, and further described it as the most reliable and accurate radiation detection system in the world.

22. At that presentation was a Dr. Robert Dunn, who, upon information and belief, was attending this presentation on behalf of IA. Dr. Dunn, along with Webb's associates C. Robert Abbott and James R. Zilka, who were officers and directors of IA, physically presented and demonstrated the IA Isotope Detection System to, among others, representatives of the Chicago Police and Fire Departments, as well as other emergency management personnel.

23. By the end of 2004, IA began more formal discussions concerning the outright purchase of V&P, rather than a joint venture. A tentative understanding was reached that, in exchange for all of V&P's outstanding shares, the shareholders of V&P would receive three million shares of IA, and $2.25 million in cash.

24. IA and V&P agreed in late 2004 and early 2005 that the $2.25 million in cash that was to be paid as part of the acquisition would be paid in $500,000 installments, with each $500,000

installment to be paid upon each additional $5 million in equity raised by the sale of IA Class A common stock.

### Defendants' Solicitation of Investors

25. Starting in late 2004 and continuing through May 2006, Defendant Webb, with others, conceived of and engaged in a fraudulent scheme to obtain monies from Plaintiffs and others by inducing them to provide "bridge" financing to reach a promised $90 to $150 million private placement or public offering.

26. IA, through the representations made by Webb, its officer and director, offered for sale and sold to Plaintiffs and others, at least 9.4 million shares of Class A common stock of IA, at a price of $1.00 per share, for a total investment of approximately $9.4 million.

27. While discussions over the acquisition of V&P continued, Webb contacted Plaintiffs who were active traders at the Chicago Mercantile Exchange (*"CME"*). Webb suggested that Plaintiffs arrange for meetings with other traders at the CME to discuss potentially investing in IA.

28. In accordance with Webb's suggestion, in February 2005 a meeting was held at the CME to discuss "bridge" financing through the sale of IA Class A common stock ("the February 2005 Meeting). Michael Lang, Christopher Lang, and other potential IA investors, including Plaintiffs WILTGEN, MEYER and MERCIER, met with Webb and others purporting to be officers and/or directors of IA at this meeting.

29. Webb introduced the Isotope Detection System at the February 2005, stating that funds were needed to support its further refinement, marketing and installation as part of IA's business plan. Webb also represented that while IA had certain funding sources and was preparing for a private placement of between $90 million and $150 million, or an initial public offering at this level, which Webb described as a "lock." IA required "bridge" financing to fund its current operations until such more permanent financing could be closed.

30. To induce potential investors such as the Plaintiffs to purchase shares of IA common stock as part of this bridge financing, Webb stated, as fact, during the February 2005 Meeting that IA

owned the Isotope Detection System. Webb further represented that IA had substantial relationships with the countries of Greece, Spain, Mexico, Italy, Singapore, the New Orleans Port Authority, the New York City Port Authority, and the cities of Chicago and Las Vegas. He stated that contracts for port security, utilizing the Isotope Detection System, were signed or being finalized by the governments of these countries or the appropriate state and local authorities. (WEBB's associates C. Robert Abbott and James R. Zilka were present and acquiesced in, or nodded to, confirm representations made by WEBB.)

31. Webb stated at the February 2005 Meeting that IA was finalizing contracts with the Greek government that exceeded $900 million for the eight Greek Olympic ports, borders, transit system, airports, key government buildings, the Greek islands and other sensitive properties.

32. Webb stated that IA had signed contracts for twenty three sea ports in Mexico, signed contracts for the largest sea port in Spain, as well as Spain's other ports and borders, and a signed contract for the City of Chicago for the Port of Calumet and rail yards.

33. Webb also represented during at the February 2005 meeting that large defense contractors, including L-3 Communications Corporation, Northrop Grumman Corporation, and General Dynamics Corporation, were in current discussions with IA concerning the purchase of the company. He stated that one of these the companies expressed interest in buying IA at $400 per share.

34. Webb further stated during the February 2005 meeting that he was a former Navy Seal, a member of the United States Armed Forces "Black Ops," and held the highest level of clearance in various police, intelligence or military enforcement agencies at the federal level, including all known and unknown agencies. He claimed to have rescued an Admiral in the United States Navy from a prison in Hanoi, Vietnam, and had saved a son of a United States General in Vietnam as well.

35. In early April, 2005, representatives of IA, including Webb and others, made another presentation at the CME ("the April 2005 Meeting") Approximately 15 existing and/or potential investors from the CME attended, including Plaintiffs Wiltgen, Meyer and Mercier.

36.     At the April 2005 Meeting, Webb once again repeated the representations he made at the February 2005 meeting, including the need for additional funds for the promotion of the Isotope Detection System and describing alleged contracts which it had entered into or was in the process of finalizing with various countries and port authorities for use of IA's the Isotope Detection System. Webb again claimed the Isotope Detection System was owned by IA and was the focus of its business operations. Webb again represented that he had been a member of the Navy Seals and "Black Ops," and again recited in detail certain claimed missions he had performed while a Navy Seal.

37.     In May, 2005, another meeting occurred at the CME (the "May 2005 Meeting"). Once again Webb attended on behalf of IA, as did others purporting to act for IA.

38.     At this May 2005 meeting, Webb again made the same representations as at the February 2005 and April 2005 meetings. Webb further stated that IA had entered into an agreement with the country of Thailand to supply IA's Isotope Detection System and other technology, claiming that he had been advised by the King of Thailand personally that some 30,000 Al-Qaeda terrorists were living in Thailand and this threat which needed to be thwarted. At this meeting, Webb agreed to provide copies of the contracts with the countries and port authorities with which IA had contracted at a future date.

39.     Over the ensuing months of 2005, Webb continued to reiterate to current and prospective investors in IA the claims about IA's ownership of the Isotope Detection System and IA's headway in signing up countries and port authorities to use the System. However, Webb made the additional claims that IA had been requested to present its technology to the Central Intelligence Agency and that Senator John McCain had asked Webb to be an advisor on Homeland Security. Receiving those materials, and/or ~~being~~ attending the presentations, in addition to Plaintiffs Wiltgen, Meyer and Mercier, was Plaintiff Karen Crane.

40.     In approximately August, 2005, Webb introduced "iaMedium" in his presentations on IA. Webb described IA Medium as a public safety communications system which coordinated sensor devices and cameras to detect dangers to the public, followed by alerts to the public about these dangers via broadcasts through terminals placed in key public areas. Thereafter, iaMedium also became a focal

point of IA's business plan in addition to the further refinement, marketing and installation of the Isotope Detection System.

41. In November, 2005, a document relating to the acquisition of V&P by IA was executed, but was made contingent upon a number of conditions, including further due diligence and payments to be made upon attaining certain levels of additional equity investments into IA, as well as other contingencies.

42. Webb made another presentation about IA at the CME in March, 2006 (the March 2006 Meeting"). Abbott and Zilka again appeared with Webb. Among the attendance at that presentation were Plaintiffs JOHN HOBAN, SR., JOHN HOBAN, JR., and KAREN CRANE.

43. At the March 2006 Meeting, Webb reiterated that contracts had been signed or were being finalized with the various countries and port authorities which he had identified in his prior presentations. He now added that Exxon/Mobil was signing a lease for 1,000 iaMedium terminals at $16,000.00 per month for 20 years. Webb told the potential investors simply "do the math" as to the cash flow that would be generated by this agreement, and advised that the offering price of $1 per share for IA common stock was, therefore, a great bargain.

44. Webb also represented during this March 2006 Meeting that Rezidor SAS, an international hotel chain operator, was in "active negotiations" with IA to put iaMedium terminals in all of its hotels throughout the world.

45. In late April, 2006, Webb, gave yet another presentation, this time at Navy Pier in Chicago, Illinois (the "Navy Pier Meeting"). Dr. Dunn also appeared at this presentation, along with other representatives of IA, and a number of existing and potential investors, including the Plaintiffs herein.

46. At the Navy Pier Meeting, Webb reiterated all of the representations as outlined above as to the contracts with various countries, and that IA owned the Isotope Detection System. Dr. Dunn spoke about and demonstrated the iaMedium product and Webb reiterated his claims about IA's contract to supply Exxon/Mobil with for 1,000 iaMedium terminals and its negotiations with Rezidor SAS.

Webb further represented that on April 27, 2006 a press release would be e issued that IA and Spain had entered into a contract with for the supply of the Isotope Detection System for the largest sea port in Spain and the iaMedium for other large city locations, and that there was a letter from the Spanish government outlining the agreement.

47. Based upon the representations at the March 2006 and Navy Pier Meetings, Plaintiffs are informed and believe that approximately $1.7 million in additional Class A common stock of IA was sold to existing and new investors in IA. Plaintiffs JOHN HOBAN, SR., HOBAN, JR., JEFFREY MEYER, and Plaintiff JOHN WILTGEN acquired shares and/or additional shares at that time.

48. Based on the representations at the February, April and May 2005 Meetings at the CME, Plaintiffs and other investors who had attended the meetings purchased shares of IA common stock again at a price of $1.00 per share. The amounts and dates of Plaintiffs' subscriptions were:

(A) On or about May 11, 2005, JOHN WILTGEN purchased 50,000 shares of Class A common stock of IA, at a price per share of one dollar ($1.00); on May 16, 2005, he purchased an additional 25,000 shares; and in March, 2006, he purchased an additional 50,000 shares, for a total of 125,000 shares.

(B) JEFFREY MEYER acquired 13,000 shares (price $1.00/share) on May 12, 2005, and an additional 13,000 shares in March, 2006 for a total investment of $26,000.00.

(C) KAREN CRANE acquired 15,000 shares in February, 2006, at a price of $1.00/share.

(D) JAMES MERCIER acquired 75,000 shares in April and May, 2005, at a price of $1.00/share.

(E) JOHN HOBAN, SR. acquired 10,000 shares in March, 2006, at a price of $1.00/share.

(F) JOHN HOBAN, JR. acquired 10,000 shares in March, 2006, at a price of $1.00/share.

### The Discovery of Defendants' Misrepresentations

49. On or about May 30, 2006, Webb held a telephonic update to IA investors/shareholders. Although previously advising Plaintiffs and other investors in 2006 that no further funds were necessary as part of the "bridge" financing, Webb began the presentation by stating that if another $5 million was

not raised through the sale of additional shares of IA common stock by July, 2006, IA's operations would have to be "suspended." Webb never explained why IA was in financial straits, only that cash needed to be raised in short order for IA's operations to continue.

50. After Webb's telephone conference with the investors/shareholders, Michael Lang, who had become a significant investor in IA and had just been elected a member of its Board, became concerned about the representations previously made by Webb to investors. Accordingly, Michael Lang arranged a meeting between Webb, himself, and approximately six investors, including Plaintiff JOHN WILTGEN for early June, 2006 at the CME.

51. Although Webb continued to claim IA had the contracts with various countries and port authorities as he had previously identified were true, Lang did not receive any concrete evidence of the existence of the contracts at the June 2006 meeting with Webb.

52. Michael Lang and another IA board member, Howard Carroll, were then invited by a consultant to IA to travel to Houston, Texas to discuss various statements made by Webb when soliciting investor money in IA. When in Houston, Lang and Carroll were advised that, contrary to what Webb had stated in the March, 2006 meeting at the CME, there were no negotiations whatsoever for any lease of iaMedium terminals to Exxon/Mobil, and that Webb was committing fraud with such statements.

53. Michael Lang and other directors of IA (other than Webb and other officers) therefore called a special board meeting of IA on June 13, 2006. Webb and the other officers, including Abbott and Zilka were notified of this meeting and requested to explain with specificity the statements previously made as to existing or soon to be finalized contracts with the various countries, cities and port authorities. They were also asked to explain IA's the current lack of funds to maintain business operation, when over $9.4 million had been was raised by the sale of the Class A shares.

54. Neither Webb nor other officers responded to the Board or otherwise produced any of the requested financial books and records of IA.

55. None of the contracts which Webb and other officers claimed were in existence or were in negotiation have ever come to fruition. Furthermore, Plaintiffs have learned that IA never owned the Isotope Detection System. InfraAegis continues to operate, albeit, continually seeking further capital.

### Count I - Violation of Section 10(b) of the Exchange Act and Rule 10(b) (5)

56. Plaintiffs repeat Paragraphs 1 through 59 above as Paragraph 60 of this Count I as though fully set forth herein.

57. Defendant Webb has violated Section 10(b) of the Exchange Act and 10(b) (5) promulgated thereunder as more fully described above by:

    a. employing devices, schemes, and artifices to defraud;

    b. making untrue statements of material fact and/or omitting to state material facts necessary to make the statements not misleading; and

    c. engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Class A common stock of IA during the Relevant Period, all in relation to IA's claimed intellectual property rights associated with the Isotope Detection System, the existence of contracts that had been executed or were about to be finalized for the deployment of the Isotope Detection System and iaMedium terminals, Webb's resume and military history, Webb's contacts with and statements attributed to high ranking government officials, and the primary uses of funds generated by the sale of IA's Class A common stock.

58. The aforesaid misrepresentations were done intentionally and in order to induce Plaintiffs to rely upon the misrepresentations, and otherwise were materially false and misleading because at the time they were made by IA, Webb and others acting as corporate officers of IA, they were made with the knowledge they were false, or recklessly ignoring, but failing to disclose, the matters set forth herein.

59. Plaintiffs did rely upon said misrepresentations made by the defendants and as a proximate result paid $1.00 per share for IA's Class A common stock during the Relevant Period. Had Plaintiffs known the truth about the foregoing, they would not have purchased any Class A common stock of IA.

60. When the falsities of the Defendant's misrepresentations became known to the Plaintiffs, any value of the Class A common stock disappeared.

61. The Class A common stock of IA is, in fact, believed to be worthless.

62. Any effort to sell the Class A common stock of IA would be futile.

63. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other members of the class suffered damages in connection with their purchases of IA's stock during the Relevant Period.

**WHEREFORE**, Plaintiffs JOHN R. WILTGEN, JAMES MERCIER, JEFFREY MEYER, KAREN CRANE, JOHN HOBAN SR. AND JOHN HOBAN JR. pray for relief and judgment, as follows:

    A. Awarding compensatory damages in favor of Plaintiffs against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    B. Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    C. Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable relief and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure Plaintiffs an effective remedy.

### Count II - Violation of Illinois Securities Act

64. Plaintiffs repeat and reallege paragraphs 1 through 63 above as Paragraph 64 of this Count II though fully set forth herein.

65. Defendant Webb has violated Section 12 (F), (G), and (I) of the Illinois Securities Act, 815 ILCS 5/12 (F), (G) & (I), as more fully described above by:

    a. employing devices, schemes, and artifices to defraud;

    b. making untrue statements of material fact and/or omitting to state material facts necessary to make the statements not misleading; and

    c. engaged in acts, practices, and a course of business which operated as a fraud and

deceit upon the purchasers of Class A common stock of IA during the Relevant Period, all in relation to IA's claimed intellectual property rights associated with the Isotope Detection System, the existence of contracts or the status of execution of contracts for deployment of the Isotope Detection System and iaMedium terminals, Webb's resume and fictional military exploits, Webb's contacts with and statements attributed to high ranking government officials, and the primary uses of funds generated by the sale of IA's Class A common stock.

66. The aforesaid misrepresentations were done intentionally and in order to induce Plaintiffs to rely upon the misrepresentations, and otherwise were materially false and misleading because at the time they were made by IA, WEBB and others acting as corporate officers of IA, they knew or recklessly ignored, but failed to disclose, the matters set forth herein.

67. Plaintiffs did rely upon said misrepresentations made by the defendants and as a proximate result paid $1.00 per share for IA's Class A common stock. Had Plaintiffs known the truth about the foregoing, they would not have purchased any Class A common stock of IA during the Relevant Period.

68. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other members of the class suffered damages in connection with their purchases of IA's stock during the Relevant Period.

69. Defendant IA, and Defendant Webb as officer and director of IA, are liable to Plaintiffs and the class members pursuant to Section 13(A)(1) of the Illinois Securities Act, 815 ILCS 5/13(A)(1), for the full amount of consideration paid by the Plaintiffs and class members for the Class A common stock of IA, plus 10% interest, plus the costs and expenses, including attorneys' fees, incurred by Plaintiffs in enforcing their rights against Defendants.

70. Plaintiffs conferred with counsel, who after investigation determined and advised Plaintiffs that they could elect to rescind the purchase of the securities. The instant complaint was filed less than six months after Plaintiffs met with their counsel and were so advised.

**WHEREFORE**, Plaintiffs JOHN R. WILTGEN, JAMES MERCIER, JEFFREY MEYER, KAREN CRANE, JOHN HOBAN SR. AND JOHN HOBAN JR. request that the Court enter judgment against Defendants for all damages available to Plaintiffs pursuant to Section 13 of the Illinois Securities Act, including costs and attorneys' fees, and grant them all other relief deemed just and proper, as well as any extraordinary equitable relief and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure Plaintiffs an effective remedy.

### COUNT III - Common Law Fraud

71. Plaintiffs repeat and reallege Paragraphs 1 through 59 of Count I as and for Paragraph 71 of this Count III as though fully set forth herein.

72. The aforementioned representations or omissions of the Defendants concerned material facts.

73. Defendants made such misrepresentations or omissions with knowledge that the statements were false or knowingly omitting to state material facts necessary to make the statements not misleading.

74. Defendants made such misrepresentations or omissions with the intention of inducing Plaintiffs to purchase the Class A common stock of IA during the Relevant Period.

75. Plaintiffs relied upon the representations made by the Defendants in purchasing the Class A common stock of IA.

76. Plaintiffs suffered damages resulting from their reliance on the representations made by the Defendants.

**WHEREFORE**, Plaintiffs JOHN R. WILTGEN, JAMES MERCIER, JEFFREY MEYER, KAREN CRANE, JOHN HOBAN SR. AND JOHN HOBAN JR. request that the Court enter judgment against Defendants for all damages available to Plaintiffs by virtue of the conduct alleged herein, in an amount to be proven at trial, as well as punitive damages in an amount deemed appropriate by the Court to deter Defendants from engaging in such conduct in the future, together with the Plaintiffs' costs and attorneys' fees, and further grant them all other relief deemed just and proper, including any extraordinary equitable relief and/or

injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure Plaintiffs an effective remedy.

### Jury Demand

Plaintiffs demand a trial by jury.

Respectfully submitted,
JAMES R. WILTGEN, JAMES MERCIER,
JEFFREY MEYER, KAREN CRANE,
JOHN HOBAN, SR. and JOHN HOBAN, JR.,
Plaintiffs

By: _____

Saul R. Wexler (#21868)
George L. Grumley
Merle L. Royce
70 West Madison, Suite 2100
Chicago, IL 60602
312-558-9191